# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                                        E-Filing
-----------------------------------------------------------------------x
CONCORD CAPITAL MANAGEMENT, LLC,
                                                         Index No.: 653053/2011
                                      Plaintiff,

              - against -                                 **VERIFIED COMPLAINT**

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, EARLE H. JOHNSON,
MICHAEL J. MULLARNEY, ELLEN S. SINGER,
John and Jane Does 1-10, and XYZ Corps. 1-10

                                      Defendants.
-----------------------------------------------------------------------X

       Plaintiff Concord Capital Management, LLC (formerly known as InsCap Management,

LLC) ("Concord"), for its verified complaint against defendants The Northwestern Mutual Life

Insurance Company ("NML"), Earle H. Johnson ("Johnson"), Michael J. Mullarney

("Mullarney"), and Ellen S. Singer ("Singer") (the individual defendants, Johnson, Mullarney

and Singer referred to collectively as the "Agents"), states:

                              **NATURE OF ACTION**

       1.     This action arises out of a venal scheme orchestrated by NML and its Agents, in

collusion with two former Concord executives named Ira Brody ("Brody") and Edward H.

Netherland ("Netherland"), to loot Concord through the purchase of unnecessary and excessive

whole life insurance policies on behalf of certain of its executives which Concord could not

afford, did not need, did not actually qualify for, and was destined to default on -- the real

purpose of which was to enrich the Agents through large commissions, NML through large

premiums, and Brody and Netherland through kickbacks that they sought from the Agents and

NML, which they obliged.

2.      Smitten by the prospect of large commissions and premiums, and the lure of even more business with Concord, the Agents and NML bought into Brody's and Netherland's plan and willingly aided and abetted them by: (a) paying hundreds of thousands of dollars in kickbacks to shadow entities that were not affiliated with Concord in order secure Concord's placement of large commission-rich whole life insurance policies with NML; (b) concocting an elaborate "something-for-nothing" artifice with Brody and Netherland to use the individual insureds' finances rather than Concord's to justify the issuance of policies, despite the fact that the individuals being insured were not intended to own the policies or pay the premiums, in order to circumvent potential NML underwriting issues concerning Concord, since it could not qualify for the insurance sought to be purchased based on its own financial condition and nascent stage of growth; and (c) suggesting, arranging for, and managing a circular loan scheme whereby Concord, which could not itself afford to pay the insurance premiums when due, borrowed money through independent loan accounts with high interest rates, then used it to pay the insurance premiums. Thus building up the policies' cash value, Concord then borrowed against that illusory cash value -- again at high interest rates -- to make payments on the independent loan accounts; all of this occurring for close to a year without Concord paying a penny in premiums. Eventually, with the policies on the brink of cancellation, and the Agents on the cusp of losing their large commissions, Concord made an initial premium payment of $2,800,312 at the Agents' urging, and ultimately paid $4,729,779 to NML. The result of this circular borrowing artifice was that when Concord ultimately surrendered the insurance policies to NML, the cash out value of the policies was worth a small fraction of the amount Concord paid in premiums to NML.

3.      The Agents and NML, with the collusion of Brody and Netherland, effectively concealed this scheme by, among other things, paying the kickbacks to entities controlled by Brody and/or others closely affiliated with Brody, none of which had any connection to Concord, and attempting to camouflage the kickbacks with legitimacy by calling them "consulting" and/or "professional" fees.  These illegal acts were not, and could not, have been discovered until years later, when one of the Agents, Singer, unwittingly disclosed the kickbacks.  Subsequent investigation uncovered defendants' illegal scheme, leading to this action, by which damages and rescission are sought.

## PARTIES

4.      Plaintiff Concord is a limited liability company created under the laws of Delaware with offices in the County and State of New York.

5.      Defendant NML is a mutual insurance company created under the laws of Wisconsin with its corporate headquarters and principal place of business located at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.

6.      NML is authorized to operate an insurance business in New York and regularly does and transacts business in the State and County of New York.  NML maintains a place of business at 875 Third Avenue, 23rd Floor, New York, New York 10022-7250.

7.      Defendant Johnson is an individual who, upon information and belief, is domiciled and resides in the State of New York at 330 East 39th Street, New York, New York 10016.  At relevant times, Johnson was an agent of NML and was licensed as an insurance agent under the laws and regulations of New York.

8.      Defendant Mullarney is an individual who, upon information and belief, is domiciled and resides in the State of New York at 132 East 35th Street, Apt. 16H, New York,

New York 10016.  At relevant times, Mullarney was an agent of NML and was licensed as an insurance agent under the laws and regulations of New York.

9.      Defendant Singer is an individual who, upon information and belief, is domiciled and resides in the State of New York at 230 Central Park South, Apt. 11F, New York, New York 10019-1409.  At relevant times, Singer was an agent of NML and was licensed as an insurance agent under the laws and regulations of New York.

10.      Defendants John and Jane Does 1-10 are presently unknown individuals associated with NML who were engaged in the acts alleged in this action.

11.      Defendants XYZ Corps. 1-10 are presently unknown business entities affiliated with and/or controlled by NML, which engaged in the acts alleged in this action.

## JURISDICTION AND VENUE

12.      This Court has personal jurisdiction over the defendants pursuant to CPLR 301 due to their "presence" in the State of New York and alternatively pursuant to CPLR 302(a) due to the causes of action arising from transactions of business in New York, tortuous acts committed in New York or elsewhere causing injury in New York, along with minimum contacts with New York.

13.      The basis of venue in New York County pursuant to CPLR 503 is that it is the county in which the causes of action arose and in which plaintiff resides.

## BACKGROUND

14.      Concord, earlier known as InsCap Management, LLC, was formed in 2004, and was engaged, among other things, in insurance and finance related businesses.

4

15.    During relevant times, Concord was principally managed by one Ira Brody,[1] as Chief Operating Officer/Chief Financial Officer, by Edward Netherland, as Chairman of the Board/Co-Chief Executive Officer and board member, and by Harish Raghavan ("Raghavan") as Co-Chief Executive Officer. Notably, it was Brody who managed and controlled Concord's books and records and was therefore able to control or deny access to them.

16.    Among Concord's various subsidiaries was Concord Capital Insurance Services, LLC (f/k/a InsCap Insurance Services, LLC), a multi-state licensed insurance agency.

17.    In April 2005, in an effort to raise capital and develop new lines of potential business, Concord induced an investment group, Nina Investments, LLC ("Nina"), to make capital contributions and loans totaling approximately $6.7 million to Concord Management, and $74 million to Concord Partners, LLC, a subsidiary of Concord (collectively, the "Nina Investment"). In connection with the Nina Investment, Nina was entitled to appoint two directors to Concord's Board of Directors (the "Outside Directors").

18.    The Outside Directors held no other positions with Concord and did not participate in Concord's day-to-day business.

## THE POLICIES

19.    Concurrent with the Nina Investment, on or about April 7, 2005, Concord executed a Second Amended and Restated Operating Agreement (the "Operating Agreement"). The Operating Agreement provided, among other things, that:

a.    Concord would utilize its best efforts "to obtain 'key man' insurance policies on an annual basis" for each of a group of Concord's members in the following amounts, "payable to such beneficiaries" as such Concord members designate:

---

[1]    Brody's looting of Concord and other misdeeds are the subject of pending litigation entitled Concord Capital Management, LLC et al. v. Fifth Third Bank et al., No. 650478/2010 (Sup. Ct., NY County)(the "Fifth Third Action").

(a) Edward H. Netherland: $32,875,000; (b) Harish Raghavan: (b) $32,875,000;
(c) Jamshid Ehsani: $14,000,000; (d) Rene Stuifzand: $5,000,000; (e) Robert W.
Thompson: $5,000,000; (f) Carl Meyer: $2,000,000; (g) Bal Das: $2,000,000; (h)
Ira Brody: $2,000,000; (i) James R. Gandy: $500,000; (j) Kevin Warner:
$750,000; and

b.  Upon the death of a member, the member is obligated to sell (put) his
membership interest in Concord in exchange for the payment of the proceeds of
the key man life insurance policies purchased by Concord along with the balance
of the member's capital account (the "Buy-Sell Provision") (there are additional
other benefits offered upon the death of a member tied to Concord's free cash
flow and the member's vested percentage interest in Concord).

20.    Upon information and belief, the use of the term "on an annual basis" in the
Operating Agreement reflected Concord's intent to purchase *term* life insurance policies, which
are based on one-year policy periods.  There are no provisions in the Operating Agreement that
contemplate the purchase of whole life policies.

21.    Although Concord had its own insurance agency (a fact known to the Agents) and
could therefore have served as insurance agent for the purchase of any policies insuring the lives
of its members, thereby offsetting Concord's expense in connection with securing the same, in or
about May/June 2005, Brody and Netherland nevertheless enlisted and engaged the Agents, on
behalf of Concord, to secure key man insurance policies for certain high level key Concord
members, because, upon information and belief, the agents could be co-opted to facilitate
Brody's and Netherland's scheme to loot Concord.

22.    Life insurance policies in connection with closely held business interests typically are structured in one of two ways.  One is for the policy to serve as a vehicle to protect the company from the adverse risk of the death of a key employee or executive upon whose longevity the company depends, particularly in goodwill.  In that instance, the company pays for a policy insuring the life of the key man and is named as the beneficiary, with the proceeds of the policy payable to the company (a "Traditional Key Man Policy").

23.    The other is when a company purchases life insurance policies on the lives of individuals with ownership interests in the company, the proceeds of which are used as a mechanism to buy out their ownership interest in the company upon death, instead of the interest passing to the employee/owner's estate (a "Buy-Sell Policy").  In that instance, the company pays for and owns the policy, but the insured employee/owner designates the beneficiary who will receive the life insurance proceeds in exchange for surrendering the deceased's estate's ownership interests in the company.  As such, the company does not get the insurance proceeds upon the employee/owner's death, but rather, obtains the employee/owner's equity and retains control.  The value of a Buy-Sell Policy is tied to the value of the shareholder's ownership interest in the company in order to assure that the company does not over insure the shareholder, and thus not overpay for his ownership interest upon his death.  In most instances, either the company's governing documents or a buy-sell agreement will provide a mechanism for the insured's surrender of his ownership interest in the company upon his death in exchange for, among other things, the proceeds of the Buy-Sell Policy.  Here, this was accomplished through the Operating Agreement's Buy-Sell Provision.

24.    Life insurance policies can be variously structured.  However, one basic distinction in their variation is that policies are typically either "whole life" or term policies.

25.    Whole life insurance policies do not have a limited term and are intended to accrue a cash value as premiums are paid.  That cash value accrues over time and accrues in addition to the expected policy death benefit.  The policy owner is thus able to borrow against the cash value of the policy during the life of the insured.

26.    By contrast, term life insurance policies provide coverage at a fixed rate of premium payments for a limited period of time, upon which they expire with no accrued cash value.  If the term runs prior to the death of the insured, coverage expires and the insured obtains no benefit for the premiums that were paid.

27.    Premiums on whole life insurance policies are significantly higher (often ten times or more) than premiums on term life insurance policies for the same individual at the same insurance coverage level, the primary difference being in cash value and an unlimited term of insurance.

28.    Term life insurance is the preferred vehicle for key man or buy-sell insurance protection by companies because: (a) of its fractional cost compared to whole life insurance; and (b) it has far greater flexibility in increasing or decreasing the levels of coverage, including discontinuing coverage completely, to allow companies to excise themselves from policies for individuals who have already divested their interests or are no longer connected with the company or who have decreased importance to the company, and also to allow for changes to policies to reflect the changes in the company's valuation.  It is even more common for term life insurance to be used for key man policies when a company does not have significant excess cash flow, is newly formed, has low revenues, and/or is in a transitional phase.

29.    All of the individuals for whom Brody and Netherland discussed the purchase of policies for were aligned with them and had an ownership stake in Concord; to wit: Harish

Raghavan, co-chief executive officer of Concord, as well as an officer of some Concord subsidiaries; Jamshid Ehsani, member of the Concord board of directors, and an officer of some Concord subsidiaries; Robert Thompson, managing director of Concord; Rene Stuifzand, chief operating officer of Concord just prior to Brody and an officer of some Concord subsidiaries; Bal Das, Concord general counsel; Carl Meyer, managing director of Concord; and Ira Brody, chief financial officer and chief operating office of Concord (collectively, the "Insureds").

30.    At the time Brody and Netherland were discussing the insurance policies with the Agents, the Insureds owned approximately 83% of Concord; to wit: Edward Netherland- 28.72% (half in his name, half in trust for his benefit); Harish Raghavan- 28.72%; Jamshid Ehsani- 12.23%; Robert Thompson- 4.37%; Rene Stuifzand- 4.37%; Ira Brody- 1.75%; Bal Das- 1.75%; Carl Meyer- 1.75%.

31.    Upon information and belief, Brody and Netherland advised the Agents that they wished to secure life insurance policies on behalf of the Insureds in the amount of $90,000,000. The amounts sought for the Insureds was: Edward Netherland- $30,000,000; Harish Raghavan- $30,000,000; Jamshid Ehsani- $14,000,000; Robert Thompson- $5,000,000; Rene Stuifzand- $5,000,000; Ira Brody- $2,000,000; Bal Das- $2,000,000; and Carl Meyer- $2,000,000 (the "Policy Amounts").

32.    Because the Insureds owned approximately 83% of Concord, it was valued by these Policy Amounts at $110,000,000.  Although comparable insurance amounts were set forth in the Operating Agreement, this valuation of Concord was not supported by any objective metric of valuation.

33.    Upon information and belief, in discussing the purchase of the policies with the Agents, Brody and/or Netherland advised them that in order for the Agents to secure the

placement of the policies with NML, Brody and Netherland required the payment of large

kickbacks from the Agents and/or NML, to entities, unaffiliated with Concord, which were

owned and/or controlled by Brody and/or Netherland (the "Kickback Recipients").

34.     Upon information and belief, the Agents and NML were aware that the Kickback

Recipients were not affiliated in any way with Concord and that Brody and Netherland intended

the kickbacks as a means, directly and indirectly, to enrich themselves at the expense of Concord

with no corresponding benefit to Concord.

35.     Upon information and belief, in order to convince the Agents and NML to pay

kickbacks, Brody and Netherland also offered the added incentive of a possible future business

relationship arising out of Concord's business of arranging for financing to its customers for the

purchase of high value life insurance policies.  The potential of that relationship between

Concord, the Agents and NML could have resulted in tens of millions of dollars in commissions

for the Agents and premiums for NML.

36.     Upon information and belief, although term life insurance policies would have

been the most appropriate type of policy for insuring the lives of Concord's members, upon

information and belief, Brody, Netherland and the Agents determined together that in order for

the purchase of policies to generate a sufficient enough commission and large enough premiums

for the Agents and/or NML to pay the kickbacks demanded by Brody and/or Netherland, the

policies that were secured would need to be whole life policies.

37.     The commissions earned by insurance agents and/or brokers on life insurance

policies are often as large as the entire first year premium.  Because the premiums on whole life

policies are typically at least ten times larger than the premiums on term life policies, so too are

the commissions paid on whole life policies typically more than ten times the commission paid on similar term policies.

38.     Thus, the purchase by Concord of whole life policies on the Insureds would result in a significantly larger commission for the Agents than would the purchase of term life insurance policies, thus enabling them to pay their share of the large kickbacks demanded by Brody and Netherland.

39.     The Agents and NML knew or should have known that whole life policies were not appropriate for Concord because of, among other things: (a) its current financial status -- including its then valuation, its earnings, and the developing and transitional nature of its then business model; (b) its inability to pay for such expensive insurance; and (c) the terms of the Operating Agreement, which is believed to have been part of NML's underwriting files.

40.     Likewise, Brody and Netherland were sophisticated insurance buyers and fully understood that the purchase of whole life policies was egregiously excessive and inappropriate for Concord.

41.     Notwithstanding their respective knowledge, and the deleterious effect such purchases would have on Concord, the Agents, Brody and Netherland, motivated by personal gain, determined to pursue Concord's purchase of whole life policies for the Insureds.

42.     Upon information and belief, the Agents consulted with NML on the best manner to structure the contemplated kickbacks so that they would appear as legitimate payments. NML advised the Agents that any kickbacks that were paid were to be structured as "consulting fees" or for "professional services" so as to best avoid detection and, at least on the surface, appear to be legitimate.

43.    Upon information and belief, the Agents and NML all knew that it was a violation of, among other things, New York State Insurance Law, to pay monies in any form, including kickbacks or rebates, in order to secure the placement of insurance policies.

44.    Upon information and belief, despite the fact that the Agents and NML knew that the demanded kickbacks were illegal, and that the Kickback Recipients did not provide any consulting or professional services to the Agents, NML, or to Concord in connection with securing life insurance policies, the Agents and NML both agreed to pay the kickbacks.

45.    Upon information and belief, applications for whole life insurance policies for the Insureds were initially submitted in mid-August 2005.

46.    Upon information and belief, because Concord could not possibly justify the purchase of whole life policies, it was anticipated by Brody, Netherland and the Agents, that NML's underwriting department would not approve whole life policies for the Insureds solely based upon Concord's *bona fides*. In a rather transparent attempt to combat this obstacle, Brody and/or Netherland solicited and obtained a letter dated August 15, 2005, purportedly from an independent law firm, which attempted to bolster and justify Concord's insurance needs at the levels sought by Brody and Netherland (the "Griffith Letter").

47.    However, it turned out that the Griffith Letter was authored by a then Concord equity holder, J. Leigh Griffith, Esq. ("Griffith"), who was aligned with Brody and Netherland and was a partner at the law firm on whose letterhead the letter was written.  Griffith's personal interest and conflict was not disclosed.

48.     All of the alleged factors addressed in the Griffith Letter weighed towards the

purchase of term Traditional Key Man policies as opposed to the whole life Buy-Sell Policies

that were ultimately purchased, including, the following:

   a.   The Insureds were unique talent whose loss to Concord would be very expensive.
        Replacing the larger partners would be most difficult if not impossible.  The
        knowledge, reputation and/or contacts in this new market area of these gentlemen
        is priceless and the mix and balance critical;

   b.   The Insureds were only being paid $150,000 each, with the possibility of
        additional compensation; and

   c.   Concord had been recapitalized and the business plan envisions substantial profits
        in the next few years (i.e., not immediately).

49.     There is nothing in the Griffith Letter which recommended or suggested the need

for Concord to make the substantial investment in whole life policies and nothing which

recommended purchasing whole life rather than term policies.

50.     Upon information and belief, the Griffith Letter was submitted along with the

Operating Agreement either concurrently with or shortly after the applications were submitted

and became part of NML's underwriting file.

51.     Upon information and belief, during the period of August 2005 through December

2005, NML engaged in the underwriting process for the policies.

52.     Upon information and belief, the initially filed applications were withdrawn on or

about December 15, 2005 because, despite the submission of the Griffith Letter, NML's

underwriting department would not approve the applications as Concord could not qualify for the

purchase of these expensive whole life policies.

53.     Upon information and belief, at the suggestion of the Agents and/or NML, new

applications for the same whole life policies were submitted for the Insureds in or about

December 2005, shortly after the initially filed applications were withdrawn. In order to try and resolve NML's underwriting issues, and to create the fiction that the Insureds themselves would be paying the premiums on the policies, information concerning the finances of the individual Insureds was submitted to be considered as part of the underwriting process.

54.    Upon information and belief, utilizing the finances of the individual Insureds to try and justify the policies, despite the fact that Concord would be paying the premiums, allowed NML to conceal the fact that Concord could not qualify for the insurance policies it sought to purchase and to avoid having its issuance of policies for the Insureds, based upon Concord's business needs, be fraudulent on its face.

55.    Whole life policies were issued by NML for the Insureds, on or about the following dates: Jamshid Ehsani and Ira Brody on January 27, 2006, Harish Raghavan on February 27, 2006, Robert Thompson on March 3, 2006, Rene Stuifzand on March 7, 2006, Carl Meyer on March 9, 2006, Bal Das on March 10, 2006, and Ed Netherland on March 22, 2006 (the insurance policies are collectively referred to as the "Policies" and the dates of issuance of the Policies are collectively referred to as the "Policy Issuance Dates").

56.    Although the Policies were issued on the Policy Issuance Dates, they were backdated to December 2005.

57.    On each of the Policy Issuance Dates, each of the Insureds established an irrevocable life insurance trust in their own names (collectively, the "ILIT's") which were the initial owners of the Policies. Upon information and belief, the use of the ILIT's was orchestrated by Brody and/or Netherland because having the Policies owned by the Insureds' trusts, even though the intent was for Concord to pay for and own the Policies, allowed NML to make the Policies appear optically legitimate.

## THE KICKBACKS

58.    Upon information and belief, Legacy Life, LLC ("Legacy Life") is a Tennessee limited liability company located at 348 Elmington Avenue, Nashville, TN 37205.  It is owned by Rita Hill, who, upon information and belief, operates the entity for the benefit of Netherland.

59.    Other than its connection to Netherland, Legacy Life had no affiliation with Concord relevant to the Policies during any time relevant to this action.

60.    Legacy Life provided no services to Concord, the Agents, or NML in connection with the Policies.

61.    Lone Star Volunteers, LLC ("Lone Star") is a New York limited liability company located at 613 Purchase Street, Rye, New York 104580.  Upon information and belief, Lone Star is owned, in part, and controlled by Brody.

62.    Other than its connection to Brody, Lone Star had no affiliation with Concord relevant to the Policies during any time relevant to this action.[2]

63.    Lone Star provided no services to Concord, the Agents, or NML in connection with the Policies.

64.    On June 15, 2006, Legacy Life issued an invoice to the Agents in the amount of $140,679.01.  The invoice indicates that it is for "Professional Services & Consulting on Insurance Issues" in the amount of $140,000.00 and "Misc. Expenses" in the amount of $679.01 the "Legacy Life Invoice").

65.    Upon information and belief, on July 5, 2006, Singer wrote a personal check in the amount of $120,000.00 to Lone Star.

---

[2]    It is worth noting that Lone Star is one of the vehicles used by Brody and Netherland to loot Concord of millions of dollars, as alleged in the Fifth Third Action.

66.    Upon information and belief, on July 21, 2006, Singer wrote a second personal check in the amount of $20,679.01 to Lone Star.

67.    On July 20, 2006, Lone Star issued an invoice to the Agents in the amount of $351,697.52.  The invoice indicates that it is for "Six Months Consulting @ $50,000 per month" in the amount of $300,000.00 and "Travel & Other Related Expenses" in the amount of $51,697.52 (the "Lone Star Invoice").

68.    Upon information and belief, NML and/or the Agents paid Lone Star the $351,697.52 reflected on the Lone Star Invoice (this $351,697.52 payment and the $140,679.01 payment by Singer are collectively referred to herein as the "Kickbacks").

69.    Upon information and belief, Brody and Netherland, with the Agents' and NML's full awareness and approval, directed that the Kickbacks be paid to Lone Star and Legacy Life so as to avoid discovery of their illegal actions, in particular by the Outside Directors.

70.    In e-mail correspondence between Singer and Brody on December 3, 2008, Singer acknowledged making payments to Lone Star in the amount of $140,679.01.  In the same correspondence, Singer asked Brody for a writing confirming the reasons why she made payments to Lone Star that were purportedly moved to Legacy Life and expressing concern about how the payments were characterized:

Hi Ira,

As per our conversation, the amount I (Ellen Singer) paid to Lonestar was $140,679.01. My accountant is seeing the auditor on Friday and I was wondering if you could reply by email with the letter and invoice suggested.  I believe that you have a letter w/invoice saying that the funds paid to Lonestar were moved to Legacy Life, LLC and that it was for professional fees.  The invoice I have from Lonestar says "as per consulting agreement".  I wish no misunderstanding and only that we work together for the best outcome of everyone.

Thank you,
        Ellen

71.    In response to Singer's December 3, 2008 e-mail and subsequent e-mails repeating her request on December 4 and 5, 2008, Brody emailed Singer the Legacy Life Invoice (the e-mail communication between Singer and Brody concerning the Kickbacks is collectively referred to herein as the "Kickback Evidence").

72.    The Kickbacks and the Kickback Evidence were effectively concealed by Brody, the Agents and NML, such that the harm to Concord was not discovered until April 2011, well into the investigation of myriad frauds engaged in by Brody against Concord which are the subject of another lawsuit, uncovered after Brody resigned from Concord and was no longer able to block access to Concord's books and records.

73.    In April 2011, the Kickbacks were first discovered by Concord during the course of conversations between former Outside Director Michael Sloan ("Sloan") and the Agents -- in particular, Singer and Johnson.

74.    In April 2011, Sloan met with Singer to review his personal insurance policies. During the course of that meeting, Singer asked Sloan about the status of Concord. During their discussion of Concord, Singer mentioned the challenge of dealing with Brody on the Policies and the "fees" that were paid in connection therewith.

75.    Surprised by the comment about "fees" being paid, Sloan requested that Singer provide more information about the recipient, timing, nature and amount of the payments. Singer initially said she would cooperate and provide additional information and got Johnson involved in the discussion.

76.    Both Singer and Johnson initially agreed that they would provide the information, and stated that they had discussed the request with various departments at NML and were awaiting approval from NML to allow them to disclose the information. However, they advised

Sloan on or about June 6, 2011, that they had retained counsel and that if he wanted the information, he would need to get it through subpoena.

77.    Thereafter, in mid-June 2011, individuals working to unwind Concord discovered the Kickback Evidence, which was effectively concealed by Brody, Netherland, the Agents and NML, through an in depth and targeted examination of Concord's books and records as a result of the information disclosed by Singer and/or Johnson in their communications with Sloan.

## THE POLICIES' FINANCING AND CONCORD'S FINANCIAL CONDITION

78.    At the time that Brody and Netherland were in the process of discussing the Policies with the Agents, Concord was in a transitional phase, having just completed the Nina Investment. As such, although Concord was growing and its revenue stream was increasing, like any start-up it had to be extremely mindful of its capital expenditures. By any objective measure, Concord could not possibly justify the enormous deployment of capital that was required to fund the purchase of whole life policies, an expense with no potential for revenue generation.

79.    On August 15, 2005, the Griffith Letter reflected that Concord: (a) had been reorganized only about four months prior; (b) was in the process of developing new proprietary products; (c) paid its members a limited draw, which is characteristic of growth company (i.e., a company that had not yet experienced substantial revenues); and (d) the Policy Amounts might be insufficient in a few years (i.e., they did not accurately reflect Concord's then financial condition).

80.    The Policies, like all life insurance policies, contained timeframes for the payment of premiums and had a grace period, here thirty-one days from the date of policy issuance, which granted the Policies' owners additional time to pay premiums and avoid cancellation.

81.    As with most life insurance policies, the Policies provided that if the initial premium is not paid within the grace period, the policy is cancelled; however, before cancellation for non-payment of premiums, the cash value is typically drawn upon to make premium payments until it is exhausted.

82.    On an annual basis, the premiums that were supposed to be paid on the Policies totaled approximately $275,000 per month ($3.3 million a year), grossly in excess of the $1.8 million a year Concord was paying in salaries to the Insureds.

83.    Because Concord could not justify the deployment of capital to pay the premiums for the Policies, which were at the time owned by the ILIT's, NML and Agents arranged for loans through the establishment of separate insurance services accounts (the "ISA's") for each of the ILIT's in or about March 2006.

84.    Upon information and belief, the ISA's each had a disproportionately high interest rate.

85.    The ISA's paid the premiums on the Policies as they became due.  As a result, the ISA's built up large loan balances.  However, at the same time, the Policies began to accrue cash value as if the premiums were actually being paid by Concord.

86.    On or about May 12, 2006, Concord advised the trustee of the ILIT's that Concord would no longer pay for the Policies (an illusory statement given that Concord had not yet paid anything towards the Policies).

87.    On or about May 23, 2006, the ILIT's each transferred ownership of its policy to Concord in exchange for debt forgiveness of loans to the ILIT's (the "Policy Ownership Transfer").  Of course, the debt forgiveness was fictional as it was based upon the fact that Concord had been loaning money to the ILIT's to pay the premiums on the Policies -- which it,

in fact, had not done. It appears that premiums were not ultimately paid by Concord until well after the Policy Ownership Transfer.

88.    Upon information and belief, the Policy Ownership Transfer was orchestrated by Brody and/or Netherland, as part of their scheme with the Agents and NML, to make the initial issuance of the Policies appear optically legitimate by being based upon the finances of the Insureds and issued in the name of the ILIT's rather than Concord. Through the Policy Ownership Transfer, they completed the deception by transferring ownership of the Policies back to Concord -- which, of course, could never have qualified on its own merit for the Policies.

89.    Upon information and belief, by the Policy Ownership Transfer, Concord, at Brody's and/or Netherland's direction, and with the Agents' and NML's guidance, was able to borrow even greater amounts against the Policies. Because the Policies were owned by the ILIT's initially, Brody and Netherland required the trustee of the ILIT's consent for any borrowing to pay the premiums on the Policies. However, by taking control away from the trustee of the ILIT's, Brody and Netherland had *carte blanche* to take any actions they wished related to the Policies, with the Agents' and NML's guidance, since they were closely aligned with all of the Insureds.

90.    Upon information and belief, as the grace period for Concord's payment on the ISA's was set to expire, Brody and Netherland, with guidance from the Agents, and with their newfound freedom in absence of the ILIT's trustee, directed that loans be made against the cash value that had accrued in the Policies, with the loan proceeds then used to pay the amounts due on the ISA's.

91.    The loans made against the cash value of the Policies had an 8.2% interest rate.

92.    In other words, because Concord could not afford to pay for the Policies, a fact well known by the Agents and NML, and effectively concealed by them by the issuance of the Policies in the name of the ILIT's, upon information and belief, Concord engaged in a pyramid-like scheme, at Brody's and Netherland's direction and with the Agents' guidance, whereby it paid for the Policies through the ISA's, and then borrowed against the Policies' cash value to pay the ISA's, with both loans incurring massive interest charges that made the Policies even more unaffordable for Concord.

93.    Through December 2006, Concord had not paid any portion of the premiums due on the Policies, and had incurred massive interest charges on the ISA's and the loans against the Policies' cash value.

94.    Upon information and belief, in December 2006, the Agents, fearing that they would lose the commissions that they earned on the Policies, some of which they used to pay the Kickbacks, pressed Concord to pay premiums on the Policies.

95.    Finally, on December 31, 2006, with the Policies on the brink of being cancelled, Concord paid NML $2,800,312.00.

96.    Thereafter, Concord made payments on the Policies and/or the ISA's as follows: (a) on January 24, 2007: $274,981.77; (b) on February 1, 2007: $286,520.08; (c) on April 1, 2007: $284,085.48; (d) on May 14, 2007: $298,058.39; (e) on May 29, 2007: $298,058.39; (f) on July 12, 2007: $40,554.00; (g) on September 26, 2007: $178.00; (h) on June 5, 2008: $262,586.00; on May 5, 2009: $131,590.00; and on May 29, 2009: $52,855.00 (collectively, along with the $2,800,312.00 payment, the "Premiums").  The Premiums paid by Concord totaled $4,729,779.11, with a large portion of that amount attributed towards the payment of interest on the ISA's and/or loans against the Policies' cash value.

97.    Despite Concord paying the Premiums, the cash value of the Policies was far lower than it would have been had Concord paid the premiums owed when due because of the interest accrued on the ISA's and the loans against the Policies.

98.    In late 2009, as Concord began to experience extreme cash flow issues, it became desperate to maximize the funds on hand and advised each of the Insureds that they had the option of: (a) paying Concord the cash out value of their respective policy and retaining the policy; or (b) surrendering their policy to Concord so that it could be cashed out with NML.

99.    Ultimately, Concord surrendered four of the eight Policies and received only a nominal amount of money from NML because of the Policies' *de minimis* surrender value. Concord never received any payments from the Insureds who retained their policies.  In total, Concord received approximately $274,981.77 for the Policies, for which it had paid $4,729,779.11.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty Against The Agents and NML)**

100.    Plaintiff incorporates by reference the allegations above.

101.    Brody and/or Netherland, as officers, directors, and/or agents, owed fiduciary duties including due care, loyalty, good faith and trust to Concord.

102.    Brody's and/or Netherland's conduct was outrageous, willful and wanton, perpetrated with bad faith, malice and reckless indifference to the rights of Concord.  Their actions were hostile and adverse to the interests of Concord and were motivated solely by greed and self-interest.

103.    The Agents and NML knew or recklessly disregarded the fact that Brody and/or Netherland were breaching their fiduciary duties to Concord.

104.    As detailed above, the Agents and NML knowingly and substantially assisted Brody's and/or the other Insiders' breaches of their fiduciary duties to Concord.

105.    Absent the collusion and participation of the Agents and NML, Brody's and/or Netherland's breaches of their fiduciary duties to Concord would have failed.

106.    The Agents' and NML's conduct was outrageous, willful and wanton, perpetrated with bad faith, malice and reckless indifference to the rights of Concord.

107.    By reason of the foregoing, Concord has been damages and is entitled to compensatory damages in an amount no less than $4,454,797.23, to be determined at trial, as well as to punitive damages in an amount no less than $10,000,000.00, to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract – Implied Covenant of Good Faith and Fair Dealing Against NML)

108.    Plaintiff incorporates by reference the allegations above.

109.    Concord, through its purchase and ultimate ownership of the Policies, and NML entered into valid and binding agreements to provide life insurance on the lives of the Insureds, for the benefit of Concord.

110.    As detailed above, NML's acts, exercised on its own accord and by and through its duly appointed agents, deprived Concord of the benefits of the Policies and thereby breached the implied covenant of good faith and fair dealing in the Policies.

111.    By reason of the foregoing, Concord has been damages and is entitled to compensatory damages in an amount no less than $4,454,797.23, to be determined at trial, as well as to punitive damages in an amount no less than $10,000,000.00, to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Aiding and Abetting Conversion Against The Agents and NML)

112.    Plaintiff incorporates by reference the allegations above.

113.    Brody and/or Netherland, directly or through entities under their control, unlawfully converted assets belonging to Concord for their own benefit.

114.    Brody and/or Netherland deprived Concord of its rights in the Kickbacks, as well as other benefits misappropriated, without Concord's consent and without lawful justification.

115.    Brody and/or the Netherland intended to and did exercise dominion and control over the Kickbacks and other misappropriated benefits belonging to Concord in a manner inconsistent with Concord's interests.

116.    As a result of Brody's and/or Netherland's unlawful conversion of monies and other benefits belonging to Concord, Concord has incurred significant losses.

117.    The Agents and NML knowingly and substantially assisted Brody's and/or Netherland's conversion of the Kickbacks and other benefits belonging to Concord.

118.    Absent the participation of the Agents and NML, Brody's and/or Netherland's conversion of Concord's property would have failed.

119.    By reason of the foregoing, Concord has been damages and is entitled to compensatory damages in an amount no less than $4,454,797.23, to be determined at trial, as well as to punitive damages in an amount no less than $10,000,000.00, to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unjust Enrichment Against The Agents and NML)

120.    Plaintiff incorporates by reference the allegations above.

121.    As detailed above, as a result of the Agents receipt of commissions and NML's receipt of the Premiums, based upon the Policies, which were secured through their illegal

actions, the Agents and NML have been wrongfully and unjustly enriched and received a benefit to which they were not entitled.

122.    By reason of the foregoing, Concord has been damages and is entitled to compensatory damages in an amount no less than $4,454,797.23, to be determined at trial, as well as to punitive damages in an amount no less than $10,000,000.00, to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Contract Void for Illegality Against NML)

123.    Plaintiff incorporates by reference the allegations above.

124.    As detailed above, the acts of the Agents and NML constituted multiple acts of commercial bribery and/or other illegal acts, by virtue of its payment of the Kickbacks, under the New York State Penal Code.

125.    As detailed above, the acts of the Agents and NML constituted multiple violations of the New York State Insurance Law, as applicable to both insurance agents and insurance companies doing business in the State of New York, including, among other things, its prohibitions against paying rebates and engaging in deceptive trade practices.

126.    Absent the illegal acts undertaken by the Agents and NML, Concord would not have entered into the Policies.

127.    Concord has no adequate remedy at law.

128.    By reason of the foregoing, the Policies are void *ab initio*, and Concord is entitled to, among other things to be determined at trial, rescission of the Premiums from NML, in the amount of at least $4,454,797.23.

WHEREFORE, Concord respectfully requests judgment as follows:

A.    On the First Cause of Action, a money judgment against the Agents and NML, jointly and severally, in an amount to be determined at trial, but not less than: $4,454,797.23 in compensatory damages and $10,000,000.00 in punitive damages;

B.    On the Second Cause of Action: a money judgment against NML, in an amount to be determined at trial, but not less than: $4,454,797.23 in compensatory damages and $10,000,000.00 in punitive damages;

C.    On the Third Cause of Action: money judgment against the Agents and NML, jointly and severally, in an amount to be determined at trial, but not less than: $4,454,797.23 in compensatory damages and $10,000,000.00 in punitive damages;

D.    On the Fourth Cause of Action: money judgment against the Agents and NML, jointly and severally, in an amount to be determined at trial, but not less than: $4,454,797.23 in compensatory damages and $10,000,000.00 in punitive damages;

E.    On the Fifth Cause of Action: rescission of the Premiums from the NML, in an amount to be determined at trial, but not less than: $4,454,797.23; and

F.      Such other and further relief as to the Court seems just and proper.

Dated: New York, New York
       November 2, 2011

                                        HALPERIN BATTAGLIA RAICHT, LLP
                                        *Attorneys for Plaintiff*

                                        By: _____
                                             Alan D. Halperin, Esq.
                                             Scott A. Ziluck, Esq.
                                             555 Madison Avenue, 9th Floor
                                             New York, New York 10022
                                             (212)765-9100
                                             ahalperin@halperinlaw.net
                                             sziluck@halperinlaw.net

## VERIFICATION

STATE OF NEW YORK    )
                             )SS.:
COUNTY OF NEW YORK  )

      ERIC KOSTA, being duly sworn, deposes and states:

      I am an authorized agent of Concord Capital Management, LLC. I have read the foregoing Verified Complaint and know the contents thereof; that the same is true to my knowledge, except as to the matters stated to be alleged upon information and belief, and that as to those matters I believe them to be true. The grounds of my belief as to matters not stated to be upon my knowledge are based upon a review of documents, correspondence and other relevant data in Concord Capital Management, LLC's files.

                                             ERIC KOSTA

Sworn to before me this
2nd day of November 2011

Notary Public

              SCOTT A. ZILUCK
        Notary Public, State of New York
            No. 02ZI6029780
        Qualified in Westchester County
      Commission Expires 08/30/2 013